**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA,**
**OMAHA DIVISION**

| | | |
|---|---|---|
| FRED H. KELLER, JR., *et al.*, | ) | |
| | ) | **Civil Action No. 8:10-cv-00270** |
| Plaintiffs, | ) | |
| | ) | **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| v. | ) | |
| CITY OF FREMONT , | ) | |
| Defendant. | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW**
**IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION**

Shirley Mora James, NSBA #19705
MORA JAMES LAW
601 Calvert Street, Suite A
P. O. Box 21772
Lincoln, NE 68542
T: (402) 890-2295
F: (402) 435-1006
E: SA@MoraJamesLaw.com

Ricardo Meza *
IL State Bar No. 6202784
Alejandro Aixala
IL State Bar No. 6295749
MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL FUND
11 E. Adams St.,
Suite 700
Chicago, IL 60603
Tel: (312) 427-0701
Fax: (312) 427-0691

*Application for admission pending

**Attorneys for Plaintiffs**

# TABLE OF CONTENTS


INTRODUCTION ....................................................................................................1

BACKGROUND ON ORDINANCE 5165 ........................................................................ 2

STANDARD FOR ISSUING PRELIMINARY INJUNCTION ......................................... 8

ARGUMENT ..........................................................................................................12

I. Plaintiffs are Likely to Succeed on the Merit ...........................................12

A. The Ordinance's Housing Provision is Preempted by Federal Immigration Law........................................................12

i. Direct Preemption.............................................................14

a. The Ordinance Impermissibly Relies on Immigration Classifications to Determine Eligibility for Housing not Authorized by Federal Law...............................................14

b. The Ordinance Improperly Regulates the Presence of Non-Citizens in the U.S. ......................................................18

ii. Implied Preemption...........................................................21

a. Field Preemption: The Ordinance's Housing Provision Attempts to Legislate in Fields Occupied by Congress.................................21

b. Conflict Preemption: The Ordinance's Housing Provision Conflicts with Federal Law...................................................24

B. The Ordinance's Housing Provision Is Unconstitutionally Vague...................26

i. The Ordinance is Vague because it Fails to Define Key Terms..................27

ii. The Ordinance is Vague because it Fails to Clearly Explain when Occupancy Licenses are Required.............................................30

iii. Ordinance is Vague because it Fails to Establish Enforcement Standards......31

C. The Ordinance's Employment Provision Is Preempted By Federal Immigration Law.......................................................32

i. Express Preemption.......................................................... 33

ii. Implied Preemption.......................................................... 37

a. Field Preemption...........................................................37

b. Conflict Preemption………………………………………………………….. 38

D. The Ordinance's Mandatory Requirement to Use E-Verify Is Preempted By Federal Immigration Law…………………………………………………….40

II. Plaintiffs Will Suffer Irreparable Injury if a Preliminary Injunction is Not Issued……………………………………………………………42

III. Granting a Preliminary Injunction Will Not Result in Greater Harm to the Nonmoving Party……………………………………………44

IV. Granting the Preliminary Injunction is in the Public Interest…………………………44

CONCLUSION……………………………………………………………………………44

# TABLE OF AUTHORITIES

## CASES

*Able v. United States,* 44 F.3d 128 (2d Cir. 1995) ....................9, 10, 11

*Arizona Contractors Ass'n, Inc. v. Candelaria,*
534 F. Supp. 2d 1036 (D. Ariz 2008) ....................36

*Citizens Against Rent Control v. Berkeley,* 454 U.S. 290, 295 (1981) ....................9

*City of Chicago v. Morales*, 527 U.S. 41 (1999) ....................26

*City of Fremont v. Kotas*, 279 Neb. 720, 722 (Neb. 2010) ....................2, 3

*Chamber of Commerce v. Edmondson*, 594 F.3d 742 (10th Cir. 2010) ....................24

*Chicanos Por La Causa, Inc. v. Napolitano,*
544 F.3d 976 (9th Cir. 2008) ....................36

*Chicanos Por La Causa, Inc. v. Napolitano,*
558 F.3d 856 (9th Cir. 2009) ....................36

*Chicanos Por La Causa, Inv. v. Napolitano,* 558 F.3d 856 (9th Cir. 2009)
*cert. granted sub. nom., Chamber of Commerce of the United States v. Candelaria*, 78 U.S.L.W. 3762 (U.S. June 28, 2010) (No. 09-115) ....................37

*Cramp v. Bd. Of Public Instruction of Orange Cty.*,
368 U.S. 278 (1961) ....................29

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000) ....................12, 24, 38

*Dataphase Sys. Inc. v. C L Sys. Inc.*, 640 F.2d 109 (8th Cir. 1981) ....................8, 9

*De Canas v. Bica*, 424 U.S. 351 (1976) ....................13, 14, 15, 20

*Deerfield Med. Ctr. v. City of Deerfield Beach*,
661 F.2d 328 (5th Cir. 1981) ....................44, 45

*Drax v. Reno*, 338 F.3d 98 (2d Cir. 2003) ....................32

*Elrod v. Burns*, 427 U.S. 347 (1976) ....................43

*English v. Gen. Elec. Co.*, 496 U.S. 72 (1990) ....................21

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141 (1982) ....................12, 14

*Garrett v. City of Escondido*, 465 F. Supp. 2d 1043 (S.D. Cal. 2006) ................................ *passim*

*General Motors Corp. v. Harry Brown's LLC*,
563 F.3d 312 (8th Cir. 2009) ....................................................................................43

*Giaccio* v. *Pennsylvania,* 382 U.S. 399 (1966) ...........................................................................27

*Graham v. Richardson*, 403 U.S. 365 (1971) ..........................................................................12, 13

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)...............................................................27, 29

*Hines v. Davidowitz*, 312 U.S. 52 (1941) ..........................................................................13, 25, 45

*Hoffman Plastic Compounds, Inc. v. N.L.R.B.*,
535 U.S. 137 (2002) ...................................................................................................37

*Int'l Paper Co. v. Ouelette*, 479 U.S. 481 (1986) ...........................................................................24

*Kolender v. Lawson*, 461 U.S. 352 (1983).................................................................................26, 31

*Lozano v. City of Hazleton,* 496 F. Supp. 2d 477 (M.D. Pa. 2007) .................................... *passim*

*Lucas v. Forty-Fourth Gen. Assembly of Colo.,* 377 U.S. 713 (1964) .......................................11

*Lynch v. Cannatella,* 810 F.2d 1363 (5th Cir.1987) ...................................................................22

*Missouri Bd. of Examiners for Hearing Instrument Specialists v.*
*Hearing Help Express, Inc.*, 447 F.3d 1033 (8th Cir. 2006) .............................................21

*Noe v. Henderson*, 456 F.3d 868 (8th Cir. 2006) .........................................................................14

*Pet Quarters, Inc. v. Depository Trust and Clearing Corp.*,
559 F.3d 772 (8th Cir. 2009) ..................................................................12, 14, 21, 24, 40

*Phelps-Roper v. Nixon*, 545 F.3d 685 (8th Cir. 2008) ..................................................................45

*Planned Parenthood of Minnesota, Inc. v. Citizens for Community*,
558 F.2d 861 (8th Cir. 1977) ..............................................................................43, 44

*Planned Parenthood of Minnesota, North Dakota, South Dakota v. Rounds*,
530 F.3d 724 (8th Cir. 2008) ...........................................................................8, 9, 10, 45

*Plyler v. Doe*, 457 U.S. 202 (1982)....................................................................................16, 19, 20

*Reynolds v. City of Valley Park* No. 06-CC-3802, 2007
WL 857320 (Mo. Cir. Mar. 12, 2007) ..................................................................................13

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947) .......... 21

*Saint v. Nebraska School Activities Ass'n*, 684 F. Supp. 626 (D. Neb. 1988) .......... 43, 44

*Steffel v. Thompson*, 415 U.S. 452 (1974) .......... 43

*Toll v. Moreno*, 458 U.S. 1 (1982) .......... 12, 13, 15, 19, 23, 25

*Truax v. Raich,* 239 U.S. 33 (1915) .......... 19

*University of Texas v. Camenisch,* 451 U.S. 390 (1981) .......... 8

*Villas at Parkside Partners v. City of Farmers Branch*,
08-cv-01551-B, 2010 WL 1141398 (N. D. Tex, March 24, 2010) .......... *passim*

*Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365 (2008) .......... 9

*Zadvydas v. Davis*, 533 U.S. 678 (2001) .......... 13

*Zschernig v. Miller*, 389 U.S. 429 (1968) .......... 13

## STATUTES

U.S. CONST. ART. VI, cl. 2 .......... 12

U.S. Const. art. I, § 8, cls. 4 and 3 .......... 15

8 U.S.C. §§ 1101 .......... 15, 19, 37

8 U.S.C. § 1154 .......... 19

8 U.S.C. §§ 1229a(a)(1), (a)(3) .......... 19

8 U.S.C. § 1229b .......... 19

8 U.S.C. § 1231(b)(3) .......... 19

8 U.S.C. § 1254a .......... 25

8 U.S.C. § 1255(i) .......... 25

8 U.S.C. § 1255(m) .......... 25

8 U.S.C. § 1324 .......... 21

8 U.S.C. § 1324a ....................22, 33, 34, 37, 38, 39, 40

8 U.S.C. § 1324b ....................37, 38, 39

8 U.S.C. § 1324(c) ....................22

8 U.S.C. § 1373 ....................6, 7, 16, 28

8 U.S.C. § 1621(a) ....................17

8 U.S.C. § 1621(c) ....................17

8 U.S.C. § 1621(c)(1) ....................17

## REGULATIONS

8 C.F.R. §§ 208.16-18 ....................19

8 C.F.R. § 274a.12(a)(11-13), (c)(8-11, 14, 18-20, 22, 24) ....................25

8 C.F.R. § 274a.12(c)(8)-(11), (14) ....................25, 28

8 C.F.R. § 274a.13 ....................28

24 C.F.R. § 5.508(e) ....................25

24 C.F.R. § 5.520 ....................25

65 Fed. Reg. 58,301 ....................18

# INTRODUCTION

On June 21, 2010, after over a two-year effort, City of Fremont, Nebraska voters enacted a local ordinance relating to "illegal aliens." In so doing, the City of Fremont delved into federal immigration law and followed the lead that only a handful of local communities have undertaken. Like the local ordinances in cities such as Escondido, California; Hazelton, Pennsylvania; Farmer's Branch, Texas; Riverside, New Jersey; Valley Park, Missouri; and Cherokee County, Georgia, Fremont's Ordinance 5156 ("Ordinance") seeks to regulate immigration at the local level and imposes severe burdens on tenants living in apartment complexes and the local business people who operate those complexes. The Ordinance unlawfully establishes a system of occupancy licenses whereby the City seeks to register all tenants for the purpose of identifying individuals it determines not to be "lawfully present" in the United States and ejecting them from Fremont by denying them the right to reside in rental housing and is thus an unlawful intrusion into immigration law, something local communities have no right to undertake.

Because Plaintiffs are likely to prevail on the merits of their claims against the Ordinance, and because Plaintiffs also satisfy the remaining prerequisites for issuance of a preliminary injunction, Plaintiffs are entitled to an order from this Court precluding the City of Fremont from enforcing Ordinance 5165 for the pendency of this case.

## BACKGROUND ON ORDINANCE 5165

### I. History of Enactment of Ordinance 5165

On July 8, 2008, Ordinance 5165 was proposed to the Fremont City Council. *Revised Immigration Ordinance includes Hiring*, FREMONT TRIBUNE, July 25, 2008.[1] The Ordinance prohibited the harboring of and renting to illegal immigrants as well as a provision to prohibit the hiring of illegal immigrants. *Id.* On July 29, 2008, the Fremont City Council rejected the Ordinance. *Residents Offer Ideas, Thoughts*, FREEMONT TRIBUNE, Feb. 25, 2009.[2] On September 7, 2008, Fremont residents began circulating petition to hold special election on the Ordinance. *Rally Officially Kicks off Petition Drive*, FREEMONT TRIBUNE, Sept. 7, 2008.[3] On March 25, 2009, Fremont residents obtained enough signatures to force a vote on the Ordinance. *Controversial Illegal Immigration Ordinance Could Be Put To Voters*, ASSOCIATED PRESS, March 25, 2009.[4]

On March 11, 2009, the City of Fremont filed a complaint in Nebraska state court alleging that the proposed ordinance violated the State's single subject rule and the U.S. Supremacy clause and seeking declaratory relief. *City of Fremont v. Kotas*, 279 Neb. 720, 722 (Neb. 2010). On April 20, 2009, the Nebraska District Court dismissed the City of Fremont's constitutional challenge on the ground that was non-justiciable and granted the defendants' motion for summary judgment that the Ordinance did not violate the single subject rule. *Id.* On

---

[1] *Available at*: http://fremonttribune.com/news/local/article_00576ab3-c30a-56f7-9ad4-358ad178becb.html (last visited July 21, 2010).

[2] *Available at*: http://fremonttribune.com/news/local/article_a7371171-aab2-5931-94ec-73e277d17e59.html (last visited July 21, 2010).

[3] *Available at*: http://fremonttribune.com/news/local/article_88986d36-4927-5150-a82d-4b6e847f53fe.html (last visited July 21, 2010).

[4] *Available at*: http://www.wowt.com/news/headlines/41829557.html (last visited July 21, 2010).

April 23, 2010, the Supreme Court of Nebraska in *City of Fremont v. Kotas* affirmed the Nebraska district court's dismissal of the City's preemptive challenge to the Ordinance. *Id.* The Nebraska Supreme Court held that City of Fremont's request for a declaratory judgment on the constitutionality of the proposed ordinance constituted "a request for an advisory opinion [and was] outside the jurisdiction of the court." *Id.* at 727. Additionally, the court upheld the district court's holding that the ordinance did not violate the single subject rule "[a]lthough the ordinance had several components dealing with occupancy, licensing, electronic verification, government uses, resources, and penalty provisions…. [because] the issues raised in the Measure had a natural and necessary connection with each other and were part of the general subject of regulating illegal aliens in Fremont." *Id.* at 728.

On May 14, 2010, the Ordinance was set for a Special Election. *Date Changed for Election on Ordinance*, FREMONT TRIBUNE, May 14, 2010.[5] On June 21, 2010, Fremont residents passed Ordinance 5165 by a vote of 3,906 to 2,908. *Fremont Voters Say Yes to Immigration Ordinance*, FREMONT TRIBUNE, June 22, 2010.[6] The Ordinance will go into effect on or about July 29, 2010. *City Council Approves Election Results*, FREMONT TRIBUNE, July 14, 2010.[7]

## II. Provisions of Ordinance 5165

### A. Overview

---

[5] *Available at*: http://fremonttribune.com/news/local/article_91eb8fee-5f64-11df-be86-001cc4c002e0.html (last visited July 21, 2010).

[6] *Available at*: http://fremonttribune.com/article_abf359d6-7d86-11df-928c-001cc4c002e0.html (last visited July 21, 2010).

[7] *Available at:* http://fremonttribune.com/news/local/article_3b4986a4-8ee5-11df-a0e5-001cc4c002e0.html (last visited July 21, 2010).

The Ordinance amends the Fremont Municipal Code, Ordinance No 3139, to prohibit the harboring of illegal aliens or hiring of unauthorized aliens, providing definitions, making provision for occupancy licenses, providing judicial process, repealing conflicting provisions, and establishing an effective date for the Ordinance. The introductory paragraphs of the Ordinance reflect an intent to regulate immigration and set forth the alleged rationales for passing the Ordinance which include "[t]he presence of illegal aliens places a fiscal burden on the City, increasing the demand for, and cost of, public benefits and services"; "[c]rimes committed by illegal aliens in the City harm the health, safety and welfare of U.S. citizens and aliens lawfully present in the United States"; and "[t]he employment of unauthorized aliens in the City displaces authorized United States workers and adversely affects their wages." The Ordinance contains four sections. The first sections details the prohibition against harboring of illegal aliens in an person's home, apartment, or "dwelling unit"; the creation of an occupancy license scheme used to ensure that landlords are only renting to individuals who are legally present in the U.S.; a new business license scheme requiring all employers doing business with and in the city to register with the E-Verify Program[8]; enforcement provisions for both the housing and employment provisions and definitions. Exh. A[9], Ordinance § 1 (hereinafter "Ordinance"). The second section deals with construction and severability. *Id.* at § 2. The third

---

[8] "E-Verify is an Internet-based system that compares information from an employee's Form I-9, Employment Eligibility Verification, to data from U.S Department of Homeland Security and Social Security Administration records to confirm employment eligibility." Dep't. of Homeland Security, U.S. Citizenship and Immigration Services website, *available at*: http://www.uscis.gov/portal/site/uscis/menuitem.eb1d4c2a3e5b9ac89243c6a7543f6d1a/?vgnextoid=e94888e60a405110VgnVCM1000004718190aRCRD&vgnextchannel=e94888e60a405110VgnVCM1000004718190aRCRD (last visited July 21, 2010).

[9] All exhibits references throughout this memorandum are listed in Index of Exhibits; filed separately with accompanying Exhibits A-G.

sections repeal all prior inconsistent ordinances. *Id.* at § 3. The fourth section sets forth the effective date of the ordinance, i.e., "after passage and publication according to law." *Id.* at § 4.

**B. Ordinance's Occupancy License Scheme**

Prior to leasing any rental unit in the City of Fremont, an occupant, or a prospective tenant, must apply for an "occupancy license" with the city. *Id.* at § 1(3)(A). The owner or manager of any dwelling unit (hereinafter "lessor") has no duty to acquire a license for the tenant(s). *Id.* at § 1(3)(B). The lessor, however, is required to notify the occupant or prospective tenant of the requirement to obtain a license. § 1(3)(C). A lessor may not rent or lease a property to a tenant without a valid occupancy license. § 1(3)(L).

The application for a license requires applicants to provide personal information including name, mailing address, employer, date of birth, among other things. The application, however, also includes a final section regarding the individual's citizenship or status that reads:

> (a) *in cases in which the applicant is a United States citizen or national,* a signed declaration that the applicant is a United States citizen or national on a form provided by the City, which notifies the applicant that knowingly making any false statement or claim that he or she is, or at any time has been, a citizen or national of the United States, with the intent to obtain a state benefit or service is a crime under United States Code Title 18, Section 1015(e); Or *(b) in cases in which the applicant is not a United States citizen or national,* an identification number assigned by the federal government that the occupant believes establishes his lawful presence in the United States (examples include, but are not limited to: resident alien card number, visa number, "A" number, 1-94 registration number, employment authorization number, or any other number on a document issued by the U.S. Government). *If the alien does not know of any such number, he shall* so declare. *Such* a *declaration shall be sufficient to satisfy this requirement.*

Ordinance, § 1(3)(E) (emphases in original). The Ordinance states that the City will not deny an occupancy license to any occupant who submits a completed application and pays the application fee. *Id.* at § 1(3)(F). The information contained within the application is confidential, except that

the City may furnish any information to other government entities as authorized by law pursuant to 8 U.S.C. § 1373. *Id.* at § 1(3)(G)

Subsection 4 of the first section contains an enforcement provisions requiring the Fremont Police Department to submit the information of any non-citizen or non-national of the U.S. to the federal government to ascertain their immigration status. *Id.* at § 1(4). The Ordinance authorizes the Fremont Police Department to enter into a memorandum of understanding to use the Systematic Alien Verification for Entitlement (SAVE) operated by the U.S. Department of Homeland Security, or utilize any other process or system designated by the federal government. *Id.* at § 1(4)(A). If the federal government determines that the occupant is not legally present, then the occupant has sixty (60) days to obtain a correction. *Id.* at § 1(4)(B). Unless the occupant is able to correct the government's determination, the Fremont Police Department will again "reverify" the occupant's status no earlier than the 61st day. *Id.* at § 1(4)(D). If the occupant's information again indicates that they are not legally present, then a revocation of the occupancy license will be sent to their address. *Id.* The occupant must then vacate the dwelling within 45 days. *Id.*

The Ordinance makes it a violation for a lessor to lease or rent any dwelling unit without receiving an approved occupancy license from an occupant and for a lessee to lease or rent without acquiring the license as well. *Id.* at § 1(3)(L). Violators of the occupancy license provision are subject to a fine of $100 for each offense. *Id.* at § 1(3)(K). Any party affected by a revocation of an occupancy license or for violating the Ordinance may seek judicial review in a court of competent jurisdiction. *Id.* at § 1(4)(F). With respect to a question regarding the immigration status of an occupant, the Ordinance states as follows:

> In a suit for judicial review in which the question of whether the occupant is an alien not lawfully present in the United States is to be decided, that question shall

> be determined under federal law. In answering the question, the court shall defer to any conclusive ascertainment of immigration status by the federal government.
>
> [] The court may take judicial notice of any ascertainment of the immigration status of the occupant previously provided by the federal government. The court may, either sua sponte or at the request of a party, request the federal government to provide, in automated, documentary, or testimonial form, a new ascertainment of the immigration status of the occupant pursuant to United States Code Title 8, Section 1373(c). The most recent ascertainment of the immigration status of an individual by the federal government shall create a rebuttable presumption as to the individual's immigration status.

*Id.* at § 1(4)(F)(4),(5).

**C. Ordinance's Employment Provision**

The Ordinance requires all business entities applying for a business license with the City, awarded a City contract, or seeking any grant or loan from the City to execute an affidavit stating that they do not knowingly employ any "unauthorized aliens" and providing written verification that they have registered with the E-Verify program; approval of a license is conditioned upon fulfilling these requirements. *Id.* at § 1(5)(C). Every business entity "employing one or more employees and performing work within the City shall register with E-Verify" within sixty (60) days after the enactment of the Ordinance. *Id.* at § 1(5)(E). The Ordinance states explicitly that "[t]he term business entity shall include both business entities that are required to obtain a license or permit to conduct business in the City of Fremont, and *businesses that are not required to obtain a license or permit to conduct business in the City of Fremont*." *Id.* at § 1(1)(G)(emphasis added). The Employment Provision does not extend to an employer who hires an independent contractor or to "the intermittent hiring of causal labor for domestic tasks customarily performed by the residents of a dwelling." *Id.* at § 1(5)(B).

The employment provision will be enforced by the City Attorney. *Id.* at § 1(5)(H). According to the Ordinance, any business entity that fails to register with E-Verify or verify the

work authorization of their employees "shall be tried at a public hearing before the City Council." *Id.* at § 1(5)(H)(1). Furthermore, "[t]he City Attorney may bring a civil action against any business entity suspected of violating this section, by failing to register in the E-Verify Program and verify the authorization of employment in the United States of each employee hired after such registration, in a court of competent jurisdiction in Dodge County." *Id.* at §1(5)(H)(2). Also, "the City Attorney may seek injunctive relief compelling the business entity to comply with this section." *Id.*

The business entity will have the opportunity to present evidence and may appeal any decision to the District Court of Dodge County. *Id.* If the City Council determines that the business entity has violated the Ordinance it may revoke a business license, cancel any contracts and demand repayment of the loan or grant. *Id.* "Any business entity that is subjected to enforcement under this Ordinance" may seek pre- or post-deprivation judicial review of enforcement of the Ordinance or whether the City has complied with the Ordinance. *Id.* at § 1(5)(H)(1.),(2.). During the pendency of judicial review, any decision regarding licenses, contract or loans will be stayed until a determination is made by the court. *Id.* at § 1(5)(H)(1.).

## STANDARD FOR ISSUING PRELIMINARY INJUNCTION

The purpose of a preliminary injunction is to preserve the relative positions of the parties until a trial on the merits can be held. *University of Texas v. Camenisch,* 451 U.S. 390, 395 (1981). The grant or denial of a preliminary injunction rests in the discretion of the district court. In *Planned Parenthood of Minnesota, North Dakota, South Dakota v. Rounds*, 530 F.3d 724 (8th Cir. 2008) (en banc), the Court of Appeals for the Eighth Circuit reaffirmed and clarified the standards for issuing a preliminary injunction by a district court in *Dataphase Sys. Inc. v. C L Sys. Inc.*, 640 F.2d 109 (8th Cir. 1981).

Before addressing the *Dataphase* factors, a district court must first determine a party's likelihood of success on the merits. *Planned Parenthood of Minnesota*, 530 F. 3d at 731-32. "[W]here a preliminary injunction is sought to enjoin the implementation of a *duly enacted state statute*, [] district courts [must] make a threshold finding that a party is likely to prevail on the merits." *Id.*, at 733 (emphasis added). Applying this more rigorous standard "reflects the idea that governmental *policies implemented through legislation* or regulations developed through *presumptively reasoned democratic processes* are entitled to a higher degree of deference and should not be enjoined lightly." *Id.* at 732 (citing *Able v. United States,* 44 F.3d 128, 131 (2d Cir.1995) (per curiam))(emphases added). However, in all other instances where a party seeks a preliminary injunction, the district court should use the 'fair chance" of prevailing on the merits, "with a 'fair chance' meaning something less than fifty percent." *Planned Parenthood of Minnesota*, 530 F. 3d at 730; *Id.* at 732 ( "district courts should still apply the familiar 'fair chance of prevailing' test where a preliminary injunction is sought to enjoin something other than government action based on presumptively reasoned democratic processes.").

After addressing the likelihood of success on the merits, the district court must consider the specific *Dataphase* factors, namely, "the threat of irreparable harm to the movant; [] the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; . . . and the public interest." *Dataphase Systems, Inc.*, 640 F.2d at 114 ; *see also Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 374 (2008).

Unlike state legislative enactments that require debate and deliberation among elected representatives, voter initiated measures should not receive the same deference. *Cf. Citizens Against Rent Control v. Berkeley,* 454 U.S. 290, 295 (1981) ("[i]t is irrelevant that the voters . . . enacted [a statute], because the voters may no more violate the Constitution by enacting a ballot

measure than a legislative body may do so by enacting legislation."). The Eighth Circuit in *Planned Parenthood of Minnesota* stated, albeit in dicta, that only State and Federal statutes get the presumptive higher deference standard. 530 F. 3d at 732 n.8. "Where preliminary injunctions are sought to enjoin *city ordinances* or administrative actions by federal, state or local government agencies, we note that the Second Circuit has examined the circumstances surrounding such government actions to determine *to what extent the challenged action represents 'the full play of the democratic process'* and, thus, deserves the deference of the traditional test." *Id.* (citing *Able,* 44 F.3d at 131-32) (emphases added).

In *Able*, the Court of Appeals for the Second Circuit addressed the question of what deference should be given to different legislative enactments. *Able* involved a challenge to a federal statute and corollary regulations on equal protection grounds and the Court of Appeals for the Second Circuit upheld the statute and regulation specifically noting that: "the statute contained fifteen specific findings which Congress believed to justify the new policy. [] In such circumstances, it is inappropriate for this court to substitute its own determination of the public interest for that arrived at by the political branches, whether or not there may be doubt regarding the wisdom of their conclusion." *Able*, 44 F.3d at 131-32. The court found that because the legislative and executive branches had worked together to craft a policy and corresponding statutes and regulations the "full play of the democratic process" had occurred and, thus, greater deference should be given to corresponding laws. However, where the law is the result not of the full play of democratic process, but rather was an administrative agency decision within the executive branch (like a Census Bureau decision or INS decision), the lower "fair ground for litigation" standard is appropriate. *Id.* In other words, the full play of the democratic process involves measured and balanced consideration by multiple governing bodies that ensure that the

relevant law is constitutional, weighs the needs and concerns of residents and constituents against any potential negative consequences of the legislative action and ensures that the rights of discrete and insular minorities are not disregarded. However, where the law or ordinance is initiated and approved by a single body, it should not receive the same deference, especially voter initiated ordinances wherein the voters are not (necessarily) considering (or bound by oath) to uphold the U.S. or State Constitution. *Cf. Lucas v. Forty-Fourth Gen. Assembly of Colo.,* 377 U.S. 713, 736 (1964) ("constitutional rights can hardly be infringed simply because a majority of the people choose that it be.").

The Ordinance has not been subjected to the analysis would have been if it had been through the City Council rather than a referendum. In fact, the Fremont City Council originally rejected the Ordinance. Cite. The ordinance has not survived the rigors of debate at any branch of government. The City went as far as to challenge the legality/constitutionality of the referendum in state court, indicating that the elected official of the City believed there were significant legal problems with the Ordinance, specifically the City's belief that it did not have the authority to pass an ordinance that touches upon immigration.

Furthermore, in keeping with the analysis in *Able*, a city referendum should not be entitled to greater deference than the decisions of federal agencies like INS or the Census Bureau. If federal agencies, which have transparent and sophisticated regulations ensuring that they do not violate the Constitution, are entitled to limited deference, then a city ordinance that has not undergone debate or analysis by the legislative, executive, or judicial branches, and has no constitutional safeguards, should also be entitled to limited deference.

However, even if the court considers plaintiffs motion for a preliminary injunction under the more rigorous standard giving greater deference to the Ordinance, plaintiffs still contend that

they have a substantial likelihood of success on the merits because the Ordinance is preempted by federal law as it seeks to directly or implicitly regulate immigration, a field exclusively within the federal government's power, and is unconstitutionally vague in violation of the Due Process Clause of the U.S. Constitution. Accordingly, for the reasons set forth below, Plaintiffs satisfy not only the threshold prerequisite but all the prerequisites for issuing an injunction. Thus, Plaintiffs are entitled to a preliminary injunction from this Court precluding the City of Fremont from enforcing the Ordinance.

## ARGUMENT

### I. Plaintiffs are Likely to Succeed on the Merits

#### A. The Ordinance's Housing Provision is Preempted by Federal Immigration Law

The Supremacy Clause of the Constitution states that "This Constitution, and the Law of the United States . . . shale be the supreme Law of the Land." U.S. CONST., ART. VI, cl. 2. "A fundamental principle of the Constitution is that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). Federal pre-emption of state and local laws arises when a federal statute explicitly or implicitly, as evidenced by the purpose and structure of relevant federal laws or actions, excludes state or local action in the relevant field. *See Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 152-53 (1982); *see also Pet Quarters, Inc. v. Depository Trust and Clearing Corp.*,559 F.3d 772, 780 (8th Cir. 2009). In this case, the City of Fremont's Ordinance attempts to regulate an area of uniquely federal authority: immigration. *Toll v. Moreno*, 458 U.S. 1, 10 (1982). If every municipal or local government, such as Fremont, were permitted to adopt their own rules for the treatment of aliens, many problems would result for citizens and non-citizens alike. *Graham v. Richardson*, 403 U.S. 365, 382 (1971); *see Zadvydas v. Davis*, 533 U.S. 678, 700 (2001) (recognizing "Nation's

need 'to speak with one voice' in immigration matters"); *Hines v. Davidowitz*, 312 U.S. 52, 66-67, 74 (1941) (invalidating state alien registration law and explaining that laws relating to foreign nationals are intertwined with foreign relations).[10]

By attempting to regulate individuals' presence in Fremont on the basis of their immigration status, the Ordinance greatly oversteps the bounds of the municipality's power. A number of municipalities have passed laws seeking to regulate housing and rental laws based on immigration status and, to date, no court has approved a state or local rental or housing law. *See Villas at Parkside Partners*, *et al*. *v. the City of Farmers Branch Texas*, 08-cv-01551-B, 2010 WL 1141398 (N. D. Tex, March 24, 2010) (hereinafter *Farmers Branch*) (permanently enjoining housing and rental ordinances based on immigration status; *Lozano v. City of Hazleton,* 496 F. Supp. 2d 477 (M.D. Pa. 2007) (permanently enjoining rental and registration ordinances that turned on immigration status); *Garrett v. City of Escondido*, 465 F. Supp. 2d 1043 (S.D. Cal. 2006) (temporarily enjoining rental ordinance); *Reynolds v. City of Valley Park* No. 06-CC-3802, 2007 WL 857320 (Mo. Cir. Mar. 12, 2007) (permanently enjoining rental ordinance on state-law grounds).

In *De Canas v. Bica,* 424 U.S. 351 (1976), the Supreme Court laid out the three tests for determining whether a state statute or regulation is pre-empted by federal law:

> Under the first test, the Court must determine whether a state statute is a regulation of immigration. Since the power to regulate immigration is unquestionably exclusively a federal power, *any state statute which regulates immigration is constitutionally prescribed*.

---

[10] The Supreme Court has not hesitated to invalidate state laws that are preempted by federal immigration law. *See, e.g., Toll*, 458 U.S. at 9-10 (denial of student financial aid to certain visa holders); *Graham*, 403 U.S. at 376-80 (welfare denial); *Zschernig v. Miller*, 389 U.S. 429 (1968) (restriction on alien's receipt of property); *Hines*, 312 U.S. at 62-74 (Pennsylvania alien registration scheme).

> Under the second test, even if the state law is not an impermissible regulation of immigration, it may still be preempted if there is a showing that it was the clear and manifest purpose of Congress to effect a complete ouster of state power-including state power to promulgate laws not in conflict with the federal laws with respect to the subject matter which the statute attempts to regulate. In other words, *a statute is preempted where Congress intended to occupy the field which the statute attempts to regulate*.
>
> Under the third test, a state law is preempted if it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. Stated differently, *a statute is preempted under the third test if it conflicts with federal law making compliance with both state and federal law impossible.*

*Farmers Branch*, 2010 WL 1141398 at *13-14 (emphases added); *see also Noe v. Henderson*, 456 F.3d 868, 870 (8th Cir. 2006) ("Federal preemption occurs when (1) Congress explicitly prohibits state regulation; (2) Congress implicitly prohibits state regulation by pervasively occupying the regulatory field; (3) state law directly conflicts with federal law; or (4) a federal agency, acting within the scope of its delegated authority, intends its regulations to have preemptive effect"). If a statute directly regulates immigration it is a form of direct pre-emption and is constitutionally impermissible. However, even if a statue does not directly regulate immigration, but attempts to legislate in a field that Congress intends federal law to occupy ("field preemption") or conflicts with federal law ("conflict preemption"), then the statute will also be pre-empted. *De Canas v. Bica*, 424 U.S. 351 (1976); *see also Pet Quarters, Inc.***,** 559 F.3d at 780) (citing *Fid. Fed. Sav. & Loan Ass'n*, 458 U.S. at 152-53). We address each of these forms of preemption in turn.

**i. Direct Preemption**

**a. The Ordinance Impermissibly Relies on Immigration Classifications to Determine Eligibility for Housing not Authorized by Federal Law**

"Constitutional preemption," invalidates state and local enactments that attempt to regulate immigration because they are inconsistent with the constitutional grant of exclusive

authority to the federal government. *See* U.S. Const. art. I, § 8, cls. 4 and 3 (granting Congress the exclusive power "[t]o establish [a] uniform Rule of Naturalization" and "[t]o regulate Commerce with foreign Nations"); *see also Toll*, 458 U.S. at 10. Under the Supreme Court's ruling in *De Canas v. Bica* and subsequent lower court cases applying that precedent, state or local statutes may not create their own standards for assessing immigration status. *De Canas*, 424 U.S. at 354.

Although the Ordinance defines the terms "illegal aliens" and "unlawfully present in the United States" in accordance with how these terms are defined in federal law, i.e. 8 U.S.C. § 1101 et seq. *see* Ordinance § 1(1)(A),(B), and (F), the Ordinance "uses [these] classifications for purposes not authorized or contemplated by federal law." *Farmers Branch*, 2010 WL 1141398 at *16. Specifically, the immigration classifications in the Ordinance are used for the purpose of restricting access to housing and residence in the City of Fremont. However, the City of Fremont has no authority to condition residence in a rental apartment based on immigration status and, therefore, the Ordinance is in direct conflict with federal law.

Whether a municipality could condition residence in rental properties and impinge on the private right of contract was a central issue in the case of *Villas at Parkside Partners*, *et al*. *v. the City of Farmers Branch Texas*, 2010 WL 1141398 (N. D. Tex, March 24, 2010). *Farmers Branch* involved a similar local ordinance that sought to create a licensing scheme for rental housing based on immigration status. In that case, the district court granted both a preliminary and permanent injunction against the City of Farmers Branch Ordinance 2952. *Farmers Branch,* 08-cv-01551-B, dkt. #33 (Sept. 22, 2008) (district court grants preliminary injunction); dkt. #177, 2010 WL 1141398 at *20-21 (Mar. 24, 2010) (district court grants permanent injunction). As the federal district court stated in *Farmers Branch* with respect to whether using federal

immigrations classifications for the purposes of creating local, residential licensing schemes was permissible,

> The federal government, which has broad authority regarding the classification of aliens, has created a variety of classifications for different purposes, including, for example, admission and removal, provision of public benefits, and eligibility for employment. The City, in contrast, has no such authority. The context and limits of the federal scheme provides the limit to local action based on that federal classification. . . . The City has provided no federal direction or source of authority for application of an immigration status report provided pursuant to 8 U.S.C. § 1373(c) may be applied in the context of licensing access to all rental housing in a municipality.

*Id.* at *16. In other words, without federal guidance that municipalities or states can use federal immigration classifications for the purpose of determining whether an individual may reside in a city or rental properties, the City has no authority to use these federal standards. *See Plyler v. Doe*, 457 U.S. 202, 225 (1982) ("The States enjoy no power with respect to the classification of aliens. This power is 'committed to the political branches of the Federal Government.'") (citations omitted).

The Ordinance at issue conditions the issuance of a valid occupancy license on the exact same statute relied on in the *Farmers Branch* case – 8 U.S.C. § 1373. *See* Ordinance § 1(4).[11] The Fremont Police Department will then determine whether the individual is "lawfully present" based on the federal government's response. However, according to the Ordinance, the Fremont Police Department will rely on the federal government's determination based on the use of either "the Systematic Alien Verification for Entitlements (SAVE) Program operated by the U.S. Department of Homeland Security", *or* "any other process or system designated by the federal government." Ordinance § 1 (4)(A).

[11] "Promptly after issuance of an occupancy license to any occupant who has not declared himself or herself to be either a citizen or a national of the United States, the [Fremont Police] Department shall, pursuant to Title 8, United States Code, Section 1373(c), request the federal government to ascertain whether the occupant is an alien lawfully present in the United States."

The SAVE system does not (and could not) purport to determine whether an individual may be denied *residence* in the United States. Rather, that program is designed to confirm an individual's eligibility for *public benefits* under federal law. *See* 8 U.S.C § 1621(a). The ability to reside in a given municipality in private housing is not a "public benefit." *See* 8 U.S.C. § 1621(c)(1) (defining "state or local public benefit" to include, inter alia, a "professional license, or commercial license," and a "*public or assisted* housing . . . benefit") (emphases added);[12] *see also Garrett*, 465 F. Supp. 2d at 1057 ("Defendant states . . . that it could make use of the federal government's Systematic Alien Verification for Entitlements (SAVE) program to carry out this task. It is unclear to this Court, however, whether Defendant would be entitled to use the SAVE program where the Ordinance seeks to regulate landlord-tenant relationships outside of the scope of a public benefit."). Indeed, the federal government's own rules explain that results from SAVE cannot be considered a substitute for the formal determination of status that occurs through a removal proceeding and judicial review of that decision:

> [A federal entity's] finding or conclusion of unlawful presence must be supported by a determination by the Service or the Executive Office of Immigration Review, such as a Final Order of Deportation. *A Systematic Alien Verification for Entitlements (SAVE) response showing no Service record on an individual or an immigration status making the individual ineligible for a benefit is not a finding of fact or conclusion of law that the individual is not lawfully present.*

---

[12] 8 U.S.C. § 1621(c) provides as follows: "(1) Except as provided in paragraphs (2) and (3), for purposes of this subchapter the term 'State or local public benefit' means—

(A) any grant, contract, loan, *professional* license, or *commercial* license provided by an agency of a State or local government or by appropriated funds of a State or local government; and

(B) any retirement, welfare, health, disability, *public or assisted* housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit *for which payments or assistance are provided* to an individual, household, or family eligibility unit by an agency of a State or local government or by appropriated funds of a State or local government." (emphases added.)

65 Fed. Reg. 58,301 (emphasis added); *see also Lozano*, 496 F. Supp. 2d at 532 & n.58 ("More than resorting to the Basic Pilot Program or the Systematic Alien Verification for Entitlements ("SAVE") is necessary to determine if federal government seeks the removal of an individual from the United States.").[13]

A federal "verification" indicating ineligibility for benefits would be an inappropriate basis for Fremont to deny anyone access to private housing or permission to reside within the City. The incorporation of the "verification" requirement in the Ordinance's regulatory scheme only magnifies the potential for error and confusion and illustrates the City's departure from the standards and procedures of the federal immigration system. As the court in *Farmers Branch* stated regarding the similar municipal ordinance:

> [T]he City's actions related to residential occupancy licenses depend directly on responses given, in some form or another, by the federal government based on immigration classifications adopted for other purposes. By depending on determinations made under an inapplicable federal standard, the Ordinance . . . constitutes an improper regulation of immigration. [] Absent authority, the City may not extend the reach of federal immigration classifications without creating an impermissible regulation of immigration.

*Farmers Branch*, 2010 WL 1141398 at *16.

**b. The Ordinance Improperly Regulates the Presence of Non-Citizens in the United States**

The Ordinance is a "regulation of immigration" for two additional reasons. First, the Ordinance is a direct attempt to regulate the *presence* of non-citizens within our borders. Regulating presence in the United States is an exclusively federal function. *See De Canas*, 424 U.S. at 358 n. 6 ("[states] can neither add to nor take from the conditions lawfully imposed by Congress upon admission, naturalization and residence of aliens in the United States or the

[13] Individuals who are subject to an order of removal are sometimes allowed to reside in the United States under federal law and policy. *See Lozano*, 496 F. Supp. 2d at 531-32.

several states"); *Toll,* 458 U.S. at 12 (city may not impose ""an 'auxiliary burden upon the entrance or residence of aliens' that was never contemplated by Congress"; *Truax v. Raich,* 239 U.S. 33, 42 (1915) (states may not deny aliens "entrance and abode").

Fremont cannot identify or adopt a federal standard regulating presence because the federal government only decides whether it wishes to remove someone from the country through the formal procedures set out in the federal Immigration and Nationality Act ("INA"), 8 U.S.C. §§1101 et seq., and associated regulations. *See Lozano*, 496 F. Supp. 2d at 531-32 (citing 8 U.S.C. §§ 1229a(a)(1), (a)(3)). It is the federal government's burden to prove, in these adversarial proceedings, that the individual is an alien and removable. But that is only the first step of this procedure. Frequently, aliens who lack immigration status at the outset of a removal proceeding obtain temporary or permanent permission to remain in the United States during the course of the proceeding; individuals who may obtain relief from removal include spouses and other relatives of U.S. citizens and lawful permanent residents, victims of domestic violence, and individuals entitled to protection from persecution or torture. *See Plyler*, 427 U.S. at 226 ("An illegal entrant might be granted federal permission to continue to reside in this country, or even to become a citizen."); *Lozano*, 496 F. Supp. 2d at 531-32 (citing 8 U.S.C. § 1154 (procedure for granting immigrant status to certain relatives of U.S. citizens and lawful permanent residents); 8 U.S.C. § 1229b (cancellation of removal for certain relatives of U.S. citizens and lawful permanent residents, including and in addition to certain battered spouses and children); 8 U.S.C. § 1231(b)(3) (restricting removal of individuals subject to persecution); 8 C.F.R. §§ 208.16-18 (deferral of removal under Convention Against Torture)). By allowing a municipality, such as Fremont, to make its own laws regarding whether non-citizens may or may not be present or

reside in the municipality would amount to sanction local and not exclusive immigration regulation authority.

Second, the Ordinance adds various "conditions under which a legal entrant may remain," *De Canas*, 424 U.S. at 355, to those prescribed by the federal government. Federal law, regulation, and policy do not require non-citizens who have entered the country lawfully to prove their status every time they seek to change rental residences or renew a lease as a condition to remaining in the United States, but non-citizens in Fremont are subject to precisely that requirement. In addition, a legal entrant who temporarily falls out of status may, as noted above, remain in the United States in various lawful ways, and can only be required to depart if a federal immigration judge orders her removed. *See Plyler*, 457 U.S. at 241 n. 6 ("Until an undocumented alien is ordered deported by the Federal Government, no State can be assured that the alien will not be found to have a federal permission to reside in the country.") (Powell, J., concurring). But Fremont would not allow that legal entrant to remain in the City, regardless of her ability to adjust to a lawful status, obtain relief from removal, or otherwise gain the permission of the United States to remain in the country.

By attempting to deny abode to every individual who is not currently "lawfully present," the Ordinance would run roughshod over the complex system of federal classification and discretion. Put another way, the Ordinance inevitably fails to rely on any federal standard to determine whether a person is legally or illegally in the United States. Instead, the Ordinance creates its own concurrent immigration regulations. In sum Plaintiffs respectfully request that the Court invalidate the Ordinance as an unconstitutional regulation of immigration because it fails to adopt a relevant federal standard and it requires local officials to make determinations about immigration status, who are not authorized under U.S. statutes and regulations to make

these determinations. *See Lozano*, 496 F. Supp. 2d at 533 ("Immigration status can only be determined by an immigration judge.").

**ii. Implied Preemption**

**a. Field Preemption: The Ordinance's Housing Provision Attempts to Legislate in Fields Occupied by Congress**

The Ordinance is also field preempted because it explicitly creates its own "harboring" statute and intrudes on the intricate and complex federal statutory scheme regarding immigration classifications. Field preemption occurs when "a federal statutory or regulatory scheme is so pervasive in scope that it occupies the field, leaving no room for state action." *Pet Quarters, Inc.*, 559 F.3d at 780. Congress' intent to occupy a field "may be inferred from a 'scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it,' or where an Act of Congress 'touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *English v. Gen. Elec. Co*., 496 U.S. 72, 79 (1990) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)); *see also Missouri Bd. of Examiners for Hearing Instrument Specialists v. Hearing Help Express, Inc.*, 447 F.3d 1033, 1035 (8th Cir. 2006) ("Implied preemption arises when a federal law completely occupies the field of regulation so that by implication there is no room for state regulation and the coexistence of federal and state regulation is not possible.").

In this instance, the Ordinance enters into a field that Congress has explicitly sought to regulate – the harboring of certain aliens. Title 8 U.S.C. § 1324 defines the federal crime of harboring, specifically defining the conduct it wishes to proscribe, and creates a system of criminal and civil penalties. In addition, Congress set forth a specific enforcement scheme: "No

officer or person shall have authority to make any arrests for a violation of any provision of this section except officers and employees of the Service designated by the Attorney General, either individually or as a member of a class, and all other officers whose duty it is to enforce criminal laws." 8 U.S.C. § 1324(c) (authorizing "all other officers whose duty it is to enforce criminal laws" to make arrests). By allowing state and local police to make arrests for violations of the federal harboring statute, Congress evinced its intent to provide a single set of standards and procedures regarding the crime of harboring, no matter which level of government was investigating the suspect activity.

By contrast, the City of Fremont has created its own "harboring law" on top of the federal statute by making it a violation for any person or business entity that lets, leases, or rents a dwelling unit or suffers or permits the occupancy of a dwelling unit to individuals who lack "lawful presence." Ordinance, §1(2). Although the City's harboring law may coincide and "may have the effect of discouraging activity prohibited by the INA's anti-harboring provisions, 8 U.S.C. § 1324(a)(1)(A)", this does not save it from conflicting with federal law. *Farmers Branch,* 2010 WL 1141398 at *19. With respect to a similar harboring provision in the Farmers Branch Ordinance, the Federal District Court in Texas held that:

> This is not a situation where the City is aiding in the enforcement of federal immigration law based on federal standards through the means set forth by federal law; rather, the City is attempting to enforce its own scheme that incorporates federal standards for purposes not contemplated by Congress. The City may take appropriate action to enforce the nation's immigration laws, but it may not, even if it were to incorporate the proper standard, independently enforce its own immigration rules.

*Id.* (*citing Lynch v. Cannatella,* 810 F.2d 1363, 1371 (5th Cir.1987)). As in *Farmers Branch*, the City of Freemont is "attempting to enforce its own [harboring] scheme" in a way not envisioned by Congress and is entering into a field Congress has defined and carved out for federal

uniformity. Accordingly, the City cannot meddle in this field. *See Garrett*, 465 F. Supp. 2d at 1056 (finding serious field preemption concerns with similar ordinance and granting temporary restraining order).

In addition, as discussed above, the Ordinance intrudes on Congress' classification system for determining what "public benefits" are allowed to non-citizens as well as creating a presumptive notion of "legal presence" that cannot easily be verified through the mechanisms the City seeks to use. The housing and enforcement provision of the Ordinance mirrors the housing ordinance in Hazleton, Pennsylvania that was also struck down by a Federal District Court in that it assumes "1) the federal government seeks the removal of all aliens who lack legal status and 2) 'a conclusive determination by the federal government that an individual may not remain in the United States can somehow be obtained outside of a formal removal hearing.'" *Lozano*, 496 F. Supp. 2d at 530. Neither of these assumptions is accurate as the federal government may choose to allow aliens who lack legal status for a number of reasons and determinations regarding whether an alien may stay or will be deported may only occur in federal adversarial proceedings. *See Farmers Branch*, 2010 WL 1141398 at *18("This complex scheme is structured, in part, to allow federal discretion and to permit in appropriate circumstances a legal adjustment in an alien's status."); *see also Lozano*, 496 F. Supp. 2d at 531-32 (listing aliens who may be violating immigration law but are granted exemptions to work and reside in the U.S.). The scheme established by Congress leaves no space for states or cities to impose their own classifications, restrict movement between classifications, or bypass the procedures for determining removability – all of which the Ordinance attempts, and each of which is sufficient to find that it trenches on a field occupied by federal law. *See*, *e.g.*, *Toll*, 458 U.S. at 13 (INA is "a

comprehensive and complete code covering all aspects of admission of aliens") (citation and punctuation omitted).

**b. Conflict Preemption: The Ordinance's Housing Provision Conflicts with Federal Law**

A state or local law is conflict preempted if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" or makes it "impossible for a private party to comply with both state and federal law." *Crosby*, 530 U.S. at 372-73. "Conflict preemption exists where a party's compliance with both federal and state law would be impossible or where state law would pose an obstacle to the accomplishment of congressional objectives." *Pet Quarters, Inc.*, 559 F.3d at 780. However, even if both state and federal laws have an identical goal, "[a]state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach this goal." *Int'l Paper Co. v. Oullette*, 479 U.S. 481,494 (1986); *Crosby*, 530 U.S. at 380 ("[c]onflict is imminent when two separate remedies are brought to bear on the same activity") (punctuation and citations omitted); *Chamber of Commerce v. Edmondson*, 594 F.3d 742, 766-67 (10th Cir. 2010); *Farmers Branch*, 2010 WL 1141398 at *18.

For many of the reasons discussed above, the Ordinance is plainly conflict preempted because it poses an obstacle to federal enforcement of immigration laws. The Ordinance conflicts with federal law and objectives in the following ways:

- By denying residence to non-citizens who are not lawfully present, the Ordinance conflicts with federal law regulating the presences of aliens in the U.S. and granting the federal government discretion not to deport persons who are otherwise

removable. *Hines*, 312 U.S. at 62; Toll 458 U.S; at 9; *Farmers Branch*, 2010 WL 1141398 at *18; *Lozano*, 496 F. Supp. 2d at 531-32.

- By denying residence to non-citizens who are not lawfully present, the Ordinance conflicts with federal regulations granting federal permission to work to various categories of persons who may be violating the immigration laws. *See Lozano* 496 F. Supp. 2d at 531.[14]
- By creating a new registration requirements for non-citizens conflicts with Congress' registration scheme at 8 U.S.C. §§ 1301-06. *See Hines*, 312 U.S. at 74.
- By revoking occupancy licenses for any individual whose status is revealed as "unlawful," the Ordinance conflicts with the federal government's HUD regulations permitting persons lacking lawful immigration status to reside together with family members eligible for federal housing subsidies.[15]
- By requiring the federal government to make a determination whether an individual's presence is lawful, merely on the basis of a query from the Fremont Police Department, and its requirement that state judges make further determinations regarding the legality of non-citizens' presence, conflict with federal

[14] 8 C.F.R. § 274a.12(a)(11-13), (c)(8-11, 14, 18-20, 22, 24) (listing categories of persons who can receive federal permission to work, and implicitly to stay, in the United States even though they may lack lawful immigration status). These include persons who have pending applications to adjust to a lawful status pursuant to the Violence Against Women Act, *see* 8 U.S.C. § 1255(m), or under 8 U.S.C. § 1255(i), certain asylum applicants, and persons who are applying for "temporary protected status" under 8 U.S.C. § 1254a.

[15] *See* 24 C.F.R. § 5.508(e) (providing that "[i]f one or more members of a family elect not to contend that they have eligible immigration status, and other members of the family establish their citizenship or eligible immigration status, the family may be eligible for assistance . . . despite the fact that no declaration or documentation of eligible status is submitted for one or more members of the family."); *see also* 24 C.F.R. § 5.520 (providing for prorated subsidies based on the number of persons in the household eligible for benefits).

> law requiring that those decisions be made in adversarial proceedings before an immigration judge, with specified procedural protections, appeal, and judicial review, before an individual may be banished from our borders.[16]

As demonstrated above, the Ordinance is preempted in multiple ways because it (1) conflicts with federal statutes; (2) attempts to legislate in fields occupied by Congress; and (3) usurps the federal government's exclusive authority over immigration. Each of these forms of preemption is an independent ground for invalidating the Ordinance. Regardless of the precise label applied, it is plain that the Ordinance threatens the residents and landlords of Fremont as well as the carefully crafted immigration policy crafted by Congress. If every municipality or local government, such as Fremont, had the authority to impose its own differing immigration regulation scheme, the federal government's ability to set and enforce a uniform national immigration policy would be drastically compromised and seriously weakened.

**B. The Ordinance's Housing Provision Is Unconstitutionally Vague**

A law is unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment if: (1) it punishes people for behavior that they could not have known was illegal; or (2) there is a possibility of subjective enforcement of the law based on arbitrary and discriminatory deprivation of liberty interests. *See City of Chicago v. Morales*, 527 U.S. 41, 56 (1999); *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983). A court may invalidate a statute on the basis of either prong. *Morales*, 527 U.S. at 56. Here, the Ordinance is invalid in both respects.

---

[16] The City's attempt to require the federal government to make determinations regarding status whenever the City wishes such determinations to be made would also violate the Supremacy Clause by improperly "burden[ing] … federal regulations and resources." *See Garrett*, 465 F. Supp. 2d at 1057.

The Ordinance contains numerous ill-defined terms that do not provide adequate notice of landlords' and tenants' legal obligations before subjecting them to conviction and monetary penalties. *See* Ordinance § 1(3)(K) (imposing fines "[u]pon conviction"); § 1(3)(J) (discussing "prosecution" of landlords). "It is established that a law fails to meet the requirements of the Due Process Clause if it is so vague and standard less that it leaves the public uncertain as to the conduct it prohibits . . . ." *Giaccio* v. *Pennsylvania,* 382 U.S. 399, 402-403 (1966). Whether an act imposes criminal penalties or civil penalties, it must not be unconstitutionally vague. *Id.* at 403. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Because the ordinance fails to clearly define many of its terms and allows for arbitrary enforcement of its provisions, it does not provide landlords or tenants adequate notice of their legal obligations.

**i. The Ordinance Is Vague because It Fails to Define Key Terms**

Under the Ordinance, all non-citizens applying for an occupancy license in Fremont must supply, "an identification number assigned by the federal government that the occupant believes establishes his or her lawful presence in the U.S." Ordinance § 1(3)(B)(9)(b). However, under the federal system there is no such thing as an identification number that "establishes . . . lawful presence in the United States." *Cf. Lozano*, 496 F. Supp. 2d at 545. As explained above, "lawful presence in the United States" has no fixed meaning in federal immigration law and is based on incorrect assumptions about how immigration status works in the federal system. *See supra* at I.A.1.a.

Moreover, the Ordinance purports to list examples of what types of numbers would suffice: "examples include, but are not limited to: resident alien card number, visa number, "A"

number, 1-94 registration number, employment authorization number, or any other number on a document issued by the U.S. Government." S*ee* Ordinance § 1(3)(E)(9)(b). However, these numbers do not definitively establish legal immigration status under federal law. For example, an "employment authorization number," listed by the Ordinance as an example of a number establishing lawful presence in the U.S., merely indicates the number of a document that provides authorization to work in the United States, *see* 8 C.F.R. § 274a.13, and an "'A' number" simply refers to an individual's file at DHS. Individuals frequently possess an employment authorization document or an A number but lack formal immigration status. *See, e.g.,* 8 C.F.R. § 274a.12(c)(8)-(11),(14). Applicants attempting to submit the required declaration will have no way of knowing what numbers establish "lawful presence," an undefined term, and will be misled by the examples in the Ordinance. In *Lozano*, the Federal District Court addressed whether a law with similar "proof of legal status" requirements implicated the applicants privacy interest. Although the court did not directly address whether the statue was void for vagueness, the district court found that despite trial and briefing it did not understand what an applicant would be required to produce. *See Lozano*, 496 F. Supp. 2d at 545.[17]

In addition, the term "temporary guest" is entirely undefined in the Ordinance and provides insufficient notice to landlords, tenants, and their guests as to whether they may be

---

[17] We are left to conclude that the ordinances are too vague for us to determine on their face exactly what documents renters, employers and landlords must submit in order to comply. Testimony at trial did not clarify this matter. The ordinances do not require the presentation of any specific documents, and even the sections of the immigration statute that the ordinances cite do not provide a list of documents the government would use to answer the City's request for a verification of status. *See* 8 U.S.C. § 1373(c). Without a clearer statement of the documents required from those seeking rental permits or fighting off complaints under IIRA, we cannot determine the discrete types of documents at issue in this case.

*Lozano*, 496 F. Supp. 2d at 545.

violating the requirement that all "occupants" obtain an occupancy license. The Ordinance requires that every "[o]ccupant" obtain an occupancy license before he or she be permitted to rent, and excludes "temporary guest[s]" from the definition of "occupant." Ordinance § 1(1)(E), (3)(A). However, the Ordinance does not define the term "temporary." Landlords, tenants, and guests will have no way of determining whether, for example, a violation of the Ordinance occurs where a boyfriend or girlfriend of a tenant who regularly has overnight visits does not possess an occupancy license. Neither does the Ordinance provide guidance as to whether a violation occurs where a tenant's family member makes an extended visit of finite duration if he or she fails to first obtain an occupancy license. Absent clarification of the term "temporary guest," landlords, tenants, and their guests will have insufficient notice of whether they are committing a violation under the Ordinance.

Because of the uncertainty regarding what persons constitute "temporary guests," the Ordinance may inhibit exercise of the First Amendment right to association by tenants and their friends and families. If Tenant Plaintiffs First Amendment rights are being impinged, a stricter standard applies to determining whether the terms are unconstitutionally vague. *See, e.g.*, *Cramp v. Bd. Of Public Instruction of Orange Cty.*, 368 U.S. 278, 287 (1961) (applying more stringent standard because "[t]he vice of unconstitutional vagueness is further aggravated where, as here, the statute in question operates to inhibit the exercise of individual freedoms affirmatively protected by the Constitution"); *see also Grayned*, 408 U.S. at 109 ("where a vague statute 'abut(s) upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of (those) freedoms.'") (citation omitted). Without sufficient clarity, Plaintiffs Armenta, Juan Doe, Juana Doe and Juana Doe #2 may be forced to limit regular or extended visits by

loved ones or friends out of fear that they may be violating the Ordinance. *See* Exhs. C-F (Declarations Plaintiffs Armenta, Juan Doe, Juana Doe and Juana Doe #2).

**ii. The Ordinance Is Vague because It Fails to Clearly Explain when Occupancy Licenses Are Required**

In addition, the Ordinance is unconstitutionally vague because it fails to provide notice to landlords and tenants, such as all Plaintiffs, of the exact instances when a tenant must procure an occupancy license. For example, the Ordinance does not clearly explain whether a lease renewal or extension – i.e., where a tenant remains in the same rental unit and renews or extends his or her lease – entered into after its effective date constitutes a new lease or tenancy and therefore requires the securing of occupancy licenses. *Compare* Ordinance § 4 ("This ordinance shall be in full force and effect from and after passage and publication according to law…") *with* § 1(3)(D) (providing that "[a]ny relocation to a different leased or rented dwelling unit requires a new residential occupancy license"). Additionally, the Ordinance is vague with respect to whether a tenant is required to procure any occupancy license in the following instances:

- Holdover Tenant: if a lease simply expires, no new lease agreement is signed, and there is no operative written lease agreement in effect but the tenant remains in the unit;
- Month-to-Month Tenant Prior to Enactment of Ordinance: if a tenant continues to rent the same unit on a month-to-month basis that he or she resided in before the Ordinance was passed;
- New Family Member Moves In: if an occupancy permit is required when an additional family member moves into a rental unit during the term of a lease that was entered into before the Ordinance's effective date.

Based on the language of the Ordinance it is unclear whether any of these common landlord-tenant interactions would constitute a violation of the Ordinance. Accordingly, landlords and tenants are exposed to liability without adequate notice. Plaintiffs Juan Armenta, Juan Doe, Juana Doe and Juana Doe #2 are all affected by the vagueness of the Ordinance as they are month-to-month tenants who wish to continue residing in their current apartments. *See* Exhs. C-F. In addition, Plaintiff Keller is subject to liability because he is unsure whether he is required to have his tenants obtain occupancy licenses even though they were renting prior to the enactment of the Ordinance. *See* Exh. B. (Declaration Plaintiff Keller).

**iii. Ordinance is Vague because it Fails to Establish Enforcement Standards**

A statute or law also is void for vagueness if it fails to "establish minimal guidelines to govern law enforcement." *Kolender*, 461 U.S. at 357-58. In *Kolender*, the Supreme Court found a state statute unconstitutional which required persons who loitered on the streets to provide "credible and reliable" identification when requested by police officers. In holding the statute to be unconstitutionally vague, the Court recognized that the statute permitted "a standardless sweep [that] allows policemen, prosecutors and juries to pursue their personal predilections." *Id.* at 358 (citation omitted).

Like the state statute in *Kolender*, the Ordinance fails to establish minimal guidelines for the City and the Freemont Police Department to guard against the arbitrary deprivation of liberty interests. The Ordinance bestows on the Police Department the authority to charge individuals with violations of the Ordinance, but fails to provide comprehensible guidance to law enforcement to assess when a violation has occurred. Specifically, the Ordinance fails to clearly define "temporary guest[s]" who are exempted from the occupancy license requirement, thus leaving law enforcement officials free to arbitrarily and discriminatorily enforce its requirements

against persons such as Plaintiffs. Likewise, the risk of arbitrary enforcement is great because the Ordinance fails to specify whether and to what extent its requirements apply to lease renewals, extensions, holdovers, or month-to-month tenancies, or to new tenants on leases that pre-date the effective date of the Ordinance. *See supra* at I.B.i-ii.

The Ordinance is also unconstitutionally vague with respect to the type of information or documents that a tenant may submit in response to an initial deficiency notice. The Ordinance provides that after a deficiency notice is issued, a tenant "may . . . provide additional information establishing that the occupant is not an alien not lawfully present in the United States." Ordinance at § 1(3)(4) (B). The Ordinance further provides that "*[i]f* the occupant provides such additional information, the Department shall promptly submit that information to the federal government." *Id.* (emphasis added). The Ordinance entirely fails to explain what is meant by such "additional information," leaving it up to the whim of the Police Department to determine when the tenant has provided information that falls within the Ordinance and therefore when the information should be submitted to the federal government.[18] Because the Ordinance provides unfettered discretion to local officials to make these assessments, its enforcement will inevitably lead to arbitrary deprivations of both property and liberty interests.

### C. The Ordinance's Employment Provision Is Preempted By Federal Immigration Law

The Ordinance's prohibition on intentionally or knowingly employing an unauthorized alien is preempted because it attempts to regulate in an area of law already governed by federal

[18] Guidance is especially needed here for lay persons affected by the Ordinance, as immigration law is notoriously complex. *See, e.g.*, *Drax v. Reno*, 338 F.3d 98, 99 (2d Cir. 2003) (describing "the labyrinthine character of modern immigration law").

law and conflicts with federal law and policy. We address express and implied preemption in turn.

**i. Express Preemption**

In 1986, Congress amended the INA by enacting the Immigration Reform and Control Act (IRCA), which for the first time instituted sanctions for employers who employ unauthorized aliens or employ individuals without complying with the new federal verification procedure. 8 U.S.C. §1324a. To comply with this law, employers must collect information regarding an employee's identity and employment eligibility.[19] E-Verify, called the Basic Pilot Program until 2007, was created as an effort to help employers verify the work authorization of new hires.[20] The program is primarily a voluntary program. However, on June 6, 2008, President Bush amended Executive Order 12989 requiring all federal contractors to verify the employment eligibility of all persons hired during the contract term and all persons performing work within the United States on the federal contract by using the E-Verify.[21] As of September 2009, it applies to federal contracts of more than $100,000 and subcontracts of more than $3,000.[22]

---

[19] *See* Dep't. of Homeland Security, U.S. Citizenship and Immigration Services Website, *available at*: http://www.uscis.gov/portal/site/uscis/menuitem.eb1d4c2a3e5b9ac89243c6a7543f6d1a/?vgnextoid=d6f988e60a405110VgnVCM1000004718190aRCRD&vgnextchannel=d6f988e60a405110VgnVCM1000004718190aRCRD (last visited July 21, 2010).

[20] *See* Dep't. of Homeland Security, U.S. Citizenship and Immigration Services Website, *available at*: http://www.uscis.gov/portal/site/uscis/menuitem.eb1d4c2a3e5b9ac89243c6a7543f6d1a/?vgnextoid=84979589cdb76210VgnVCM100000b92ca60aRCRD&vgnextchannel=84979589cdb76210VgnVCM100000b92ca60aRCRD (last visited July 21, 2010).

[21] *Id.*

[22] *See* Dep't. of Homeland Security, U.S. Citizenship and Immigration Services Website, *available at*: http://www.uscis.gov/portal/site/uscis/menuitem.eb1d4c2a3e5b9ac89243c6a7543f6d1a/?vgnexto

These federal contractors must use the E-Verify system to confirm that all of their new hires and their employees directly working on federal contracts are authorized to legally work in the United States.[23] IRCA also contains an express preemption provision: "The provisions of this section preempt any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens." 8 U.S.C. §1324a(h)(2).

The portion of the Ordinance that regulates intentionally or knowingly employing an unauthorized alien to perform work in the City is expressly preempted unless the Act falls within this savings clause exception for "licensing and similar laws." The Ordinance purports to establish a "licensing scheme" by requiring any "business entity that applies for any business license or permit in the City, . . . to execute an affidavit . . . that the business entity does not knowingly employ any person who is an unauthorized alien . . . [and] has registered in the E-Verify Program." Ordinance § 1(5)(C). However, the Ordinance also seeks to impose an obligation on all business entities that employ "one or more employees and performing work within the City," regardless of whether they apply for a business license, to register with the E-Verify Program. *Id.* at § 1(5)(E); *see also* § 1(1)(G)("The term business entity shall include both business entities that are required to obtain a license or permit to conduct business in the City of Fremont, and businesses that are not required to obtain a license or permit to conduct business in the City of Fremont."). Based on the language of the Ordinance, it is unclear whether small business owners, such as Plaintiff Keller, who may hire employees to service his apartment

---

id=534bbd181e09d110VgnVCM1000004718190aRCRD&vgnextchannel=534bbd181e09d110VgnVCM1000004718190aRCRD (last visited July 21, 2010).

[23] *Id.*

building, would be required to comply with the Ordinance's employment provision and register with E-Verify. Exh. B at ¶¶ 14-15.

The Ordinance authorizes the City Attorney to try any business entity that is found in violation of the Ordinance either before the City Council or a court of competent jurisdiction in Dodge County. Ordinance, § 1(5)(H)(1),(2). If the business entity is found to violate the Ordinance, the City Council may suspend or revoke any license, permit, contract, loan, or grant issued by the City or seek injunctive relief compelling the business entity to comply with the Ordinance. *Id*. Because of the Ordinance's lack of clarity, Plaintiff Keller is concerned that he may be subject to legal fines and penalties for failing to comply with the employment provision of the Ordinance. Exh. B at ¶¶ 16.

Although the City may argue that the Ordinance falls within the "licensing" savings clause of IRCA, the Ordinance explicitly delineates two separate forms of compliance with the Ordinance: one for those who seek to procure a license and one for those who simply employ at least one employee in the City of Fremont. By creating this distinction, the Ordinance has arguably set up a "licensing scheme" but also clearly created an additional "condition of doing business scheme" in Fremont that is not explicitly, according to the language of the Ordinance, a licensing scheme. Although both schemes are preempted by IRCA's express preemption clause, the "condition of doing business scheme" falls outside of the arguable IRCA savings clause and is preempted by IRCA and, therefore, the City of Fremont should be enjoined from enforcing this provision.

The "licensing exemption" issue has been litigated in various district courts around the country including Arizona, Maryland and Pennsylvania. The federal district court in Pennsylvania was faced with a similar law, which sanctioned employment of an unauthorized

alien by suspending the employer's business permit. The district court found that law preempted. The court found that IRCA's express preemption provision does not allow localities to "impose any rule they choose on employers with regard to hiring illegal aliens as long as the sanction imposed is to force the employer out of business by suspending its business permit – what we could call the 'ultimate sanction.'" *Lozano*, 496 F. Supp. 2d at 519. As the court found, Congress did not intend to permit localities to provide only the "ultimate sanction" and not other, lesser, penalties. "Such an interpretation renders the express preemption clause nearly meaningless." *Id.* Rather, the court found that Congress intended the licensing savings clause to allow state and local entities only to suspend the permit of employers that violate *federal* employer sanctions, not employers who violate a state or local law. *Id.* at 517-21.

In another Federal District Court case, *Arizona Contractors Ass'n, Inc. v. Candelaria*, 534 F. Supp. 2d 1036 (D. Ariz 2008), plaintiffs challenged the Legal Arizona Workers Act, which, among other things, made mandatory employer participation in the E-Verify system as a condition of doing business in Arizona. In that case, the Arizona District Court held that IRCA authorizes, rather than preempts, the licensing sanctions in the Legal Arizona Workers Act ("Arizona Act"), *id.* at 1045; there is no conflict between the Arizona Act and IRCA, *id.* at 1052; the Arizona Act does not violate due process, *id.* at 1057; and the Arizona Act does not conflict with the Commerce Clause of the United States Constitution. *Id.* at 1061. The Ninth Circuit affirmed the Arizona District Court's decision. *Chicanos Por La Causa, Inc. v. Napolitano*, 544 F.3d 976, 988 (9th Cir. 2008). The plaintiffs petitioned for a rehearing *en banc* and the Ninth Circuit denied this request. *Chicanos Por La Causa, Inc. v. Napolitano*, 558 F.3d 856 (9th Cir. 2009). After being denied rehearing, plaintiffs petition filed a petition for a Writ of Certiorari and were granted the Writ on June 28, 2010 on the question whether federal law preempts the

Arizona Workers Act. *Chicanos Por La Causa, Inv. v. Napolitano,* 558 F.3d 856 (9th Cir. 2009) *cert. granted sub. nom., Chamber of Commerce of the United States v. Candelaria*, 78 U.S.L.W. 3762 (U.S. June 28, 2010) (No. 09-115). As the issue is pending before the Supreme Court, we urge the court to enjoin enforcement of the "licensing scheme" provision until the Supreme Court has had an opportunity to determine the questions presented. However, we also ask the court to enjoin the remaining portions of the employment provision, i.e., "condition of doing business scheme," because it is preempted by federal law.

**ii. Implied Preemption**

Even were there no express preemption, the doctrine of implied preemption would require invalidating the Ordinance's prohibition of intentionally or knowingly employing an unauthorized alien. As discussed above, *see supra* I.A.ii., state laws regarding immigration and foreign nationals are impliedly preempted "where the scope of the federal law at issue indicates that Congress intended federal law to occupy the field exclusively or where state or local laws conflict with federal laws." *Lozano*, 496 F.Supp.2d at 521 (internal quotation marks omitted).

**a. Field Preemption**

The federal government has comprehensively legislated both generally in the area of immigration (INA, 8 U.S.C. §1101, *et seq.*), and specifically with respect to employer sanctions and harboring of undocumented aliens (IRCA, 8 U.S.C. §§1324a-1324b). Indeed, the Supreme Court has held that IRCA is a "comprehensive scheme" prohibiting employment of unauthorized workers. *Hoffman Plastic Compounds, Inc. v. N.L.R.B.*, 535 U.S. 137, 147 (2002). Federal law makes it unlawful to knowingly hire an unauthorized alien (8 U.S.C. §1324a(a)(1)(A)); establish good faith defenses (8 U.S.C. §1324a(a)(3), (b)(6)); creates antidiscrimination protections (8 U.S.C. §1324b); establishes a detailed federal employment verification system (8 U.S.C.

§1324a(b)(1)); and provides for civil fines and criminal penalties (8 U.S.C. §1324a(e)(4), (f)(1)) after a hearing before a federal administrative law judge and an opportunity for appeal (8 U.S.C. §1324a(e)(2)-(3), (7)-(8)). It is inconceivable given the care that Congress took in crafting its employment verification scheme that Congress left it to every state and locality to come up with its own version of the scheme. Hence, the district court in *Lozano* concluded "IRCA occupies the field to the exclusion of State or local laws regarding employers hiring, employing, recruiting or referring for a fee for employment unauthorized aliens." *Lozano*, 496 F.Supp.2d at 523. Congress has left no room for Fremont to enact its own versions of such laws. But Fremont has legislated in precisely the field in which Congress meant to occupy exclusively and, accordingly, the Ordinance should be found preempted.

**b. Conflict Preemption**

Conflict preemption arises when a state or local law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" or makes it "impossible for a private party to comply with both state and federal law." *Crosby*, 530 U.S. at 372-73; see also *De Canas*, 424 U.S. at 358 (a law is conflict preempted if "burdens or conflicts in any manner with any federal laws or treaties"). The Fremont Ordinance poses significant obstacles to the accomplishment and execution of the full purposes and objectives of Congress.

First, the Ordinance creates its own scheme of penalties and violations for any employer on top of the federal penalties and contains no anti-discrimination provisions. Congress has already crafted its own federal scheme of penalties and created a system with strong antidiscrimination measures, recognizing that employers concerned with violating federal law might be deterred from hiring members of minority groups, especially individuals with limited English proficiency or "foreign" looking workers, to avoid liability. *See, e.g.*, H.R. Rep. 99-

682(II), at 12 (1986), 1986 USCCAN 5757, 5761. Accordingly, Congress passed 8 U.S.C. §1324b that prohibits discrimination in employment on basis of national origin. In contrast, under the Ordinance, the cost of a revocation of business license, termination of a contract or prohibition from doing business Fremont would frequently exceed the federal penalties. *See* 8 U.S.C. §1324a(e)(4)(detailing a system of civil penalties for violations). Fremont's Ordinance contains no anti-discrimination provision nor does it evince a concern that employers might abuse the verification process.[24] By failing to balance penalties for violations with a mechanism to ensure that employers do not engage in impermissible discrimination, the Ordinance fails to properly mirror or balance the federal law. *See Lozano*, 496 F. Supp. 2d at 528 (ordinance "has no anti-discriminatory provisions, and this omission represents another conflict").

Second, although Congress was concerned about imposing undue burdens on employers, H.R. Rep. 99-682(I), at 56, 90, 1986 USCCAN at 5660, 5694, the Fremont enforcement mechanism of the employee provisions of the Ordinance lowers the bar for initiating investigations and finding violations. Under the Ordinance, business entities, or employers, may have to defend themselves against state prosecution even when the federal government has not acted and will not act. The City Attorney is authorized to try a business entity before the City

---

[24] *Cf.* UNITED STATES GOVERNMENT ACCOUNTABILITY OFFICE, GAO-07-924T, CHALLENGES EXIST IN IMPLEMENTING A MANDATORY ELECTRONIC EMPLOYMENT VERIFICATION SYSTEM (June 7, 2007) *available at:* http://www.gao.gov/new.items/d07924t.pdf (last visited July 21, 2010) ("[E-Verify] is vulnerable to employer fraud that diminishes its effectiveness and misuse that adversely affects employees . . . [,]such as limiting work assignments or pay while employees are undergoing the verification process."); OFFICE OF INSPECTOR GENERAL – SOCIAL SECURITY ADMINISTRATION, EMPLOYER FEEDBACK ON THE SOCIAL SECURITY ADMINISTRATION'S VERIFICATION PROGRAM, at 6 (December 2006) *available at* http://www.ssa.gov/oig/ADOBEPDF/A-03-06-26106.pdf (study showed that 42 percent of employers pre-screen work eligibility of applicants in violation of federal law.) (last visited July 21, 2010).

Council or in a court of competent jurisdiction for any violation of the Ordinance; the Ordinance provides no evidentiary standards prior to bringing a claim against a business entity. By comparison, the federal scheme requires only complaints "which, on their face, have a substantial probability of validity" or other violations "as the Attorney General determines to be appropriate" are investigated. 8 U.S.C. §1324a(e)(1). For the reasons set forth above, the Act's provisions on intentionally or knowingly employing an unauthorized alien are conflict preempted.

**D. The Ordinance's Mandatory Requirement to Use E-Verify Is Preempted By Federal Immigration Law**

The Ordinance states that any business entity doing business in Fremont "shall use the E-Verify Program to verify the authorization of employment in the United States of each employee hired after" registering with E-Verify. Ordinance, §1(5)(F). This requirement is invalid under both conflict and field preemption. By requiring employers to use a program that Congress designated voluntary, Fremont is adopting a law that "burdens or conflicts . . . with . . . federal laws," *De Canas*, 424 U.S. at 358, and for the same reason, regulated in an area where Congress sought to oust state power, and is field preempted. *Pet Quarters, Inc.*, 559 F.3d at 780 ("a federal statutory or regulatory scheme is so pervasive in scope that it occupies the field, leaving no room for state action.").

Congress designated the E-Verify as a program to be implemented by the Secretary of Homeland Security. IIRIRA, §402(a) (providing that "any person or other entity that conducts any hiring (or recruitment or referral) . . . *may elect* to participate in that pilot program," but Secretary "*may not require* any person or other entity to participate in a pilot program") (emphases added). In contrast, the Fremont Ordinance requires all employers that seek a

business license, contract or grant and do business in Fremont to register and use E-Verify. The attempt to force employers to use E-Verify is incompatible with federal law. Congress could not have intended the use of E-Verify to be mandatory within some states while it continues to be in its experimental and evaluative stage. *See Lozano*, 496 F. Supp. 2d at 524-25 (finding preempted ordinance making participation in Basic Pilot Program mandatory). Making the Program mandatory imposes significant burdens on employers, who will need to learn how to use the Program; go through the registration process for the Program, including signing a Memorandum of Understanding ("MOU") with Department of Homeland Security ("DHS") and Social Security Administration ("SSA"); become familiar with and comply with the lengthy manual for the Program; provide a tutorial for all employer representatives who use the Program; install software; and use the Program for all new hires.

Moreover, E-Verify has documented problems with accuracy. According to a report by Westat for DHS, "tentative nonconfirmation rates . . . are much higher for foreign-born citizens than for U.S.-born employees and noncitizens; [t]he erroneous tentative nonconfirmation rate for ever-authorized foreign-born citizens between October 2004 and 2007 is approximately 10 percent." WESTAT, FINDINGS OF THE WEB BASIC PILOT EVALUATION, 57 (Sept., 2007).[25] The opportunity for discrimination against authorized immigrant workers is much higher than for U.S. born workers. Reliance on these error-ridden databases is unjust and wrong.

In addition, E-Verify places a financial burden on small businesses. The Office of the Citizenship and Immigration Services Ombudsman of DHS interviewed employers in Arizona which has a mandatory E-Verify law and found that smaller employers found E-Verify documents confusing and did not understand legal terminology. DEP'T. OF HOMELAND SECURITY,

---

[25] *Available at*: http://www.uscis.gov/files/article/WebBasicPilotRprtSept2007.pdf (last visited July 21, 2010).

*Observations on the E-Verify Experience in Arizona and Recommended Customer Service Enhancements*, Dec. 22, 2008.[26] Small businesses which, according to the Small Business Administration make up 50% of the nation's existing private payroll, are not likely to have human resources departments, legal counsel or even membership in organizations that might help them with these issues. *See* Small Business Administration Office of Advocacy, *Frequently Asked Questions*.[27] These and other problems show Congress' wisdom in making the Program voluntary and temporary. By making E-Verify mandatory, the City of Fremont's actions directly conflict with Congress' intent to reduce the burden of imposing E-Verify on all businesses, especially small businesses for which compliance will be costly and time consuming.

## II. Plaintiffs Will Suffer Irreparable Injury if a Preliminary Injunction is Not Issued

For purposes of injunctive relief, an injury is "irreparable" if it cannot be undone through monetary remedies. *General Motors Corp. v. Harry Brown's LLC,* 563 F.3d 312, 319 (8th Cir. 2009) ("Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages.") It is well settled that the violation of constitutional rights for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction. *Elrod v. Burns* 427 U.S. 347 (1976); *see also Planned Parenthood of Minnesota, Inc. v. Citizens for Community*, 558 F.2d 861, 867 (8th Cir. 1977) ("showing that the ordinance interfered with the exercise of [plaintiffs'] constitutional rights . . . supports a finding of irreparable injury."); *Saint v. Nebraska School Activities Ass'n*,

---

[26] *Available at*: http://www.dhs.gov/xlibrary/assets/cisomb_everify_recommendation_2008-12-22.pdf (last visited July 21, 2010).

[27] *Available at:* http://www.sba.gov/advo/stats/sbfaq.pdf (last visited July 21, 2010).

684 F. Supp. 626, 628 (D. Neb. 1988) ("when an alleged deprivation of constitutional rights is involved, no further showing of irreparable injury is necessary").

Plaintiffs will suffer irreparable harm if the City is allowed to enforce the Ordinance before this court determines its legality. Absent an injunction, Plaintiffs Armenta, Juan Doe, Juana Doe and Juana Doe #2 (hereinafter "Tenant Plaintiffs") are subject to irreparable harm by being forced to apply for occupancy licenses and otherwise comply with an unconstitutional law, losing their ability to move freely to other apartments in Fremont.[28] In addition, all Plaintiffs may be subject to significant fines of up to $100 per occupant of the dwelling unit for each violation under the vague terms of the Ordinance. Ordinance §1(3)(K). In particular, Tenant Plaintiffs' right to association will be infringed upon because under the ambiguous terms of the Ordinance they will be forced to limit visits by friends and family as well as limit their own visits to others' rental homes out of fear of being found criminally liable for lack of an occupancy license. *See* Ordinance §1(3)(K).

Tenant Plaintiffs, who rent their apartments on a month-to-month basis, will be forced to secure occupancy licenses on a monthly basis to avoid being found liable under the vague terms of the Ordinance, thus requiring that they expend significant amounts of time and money to continue living in Fremont. Finally, the constitutional right of all Tenant Plaintiffs to travel is limited by the Ordinance, as the additional time, money, and disruption necessary to move to a new rental dwelling in Fremont will inhibit their freedom of movement. None of these harms can be undone by an award of monetary damages.

---

[28] A facial challenge to the legality of a statute or regulation may proceed before there has been any attempted or even threatened enforcement targeting the plaintiffs. It is "not necessary that [a party] first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974).

## III. Granting a Preliminary Injunction Will Not Result in Greater Harm to the Nonmoving Party.

Although the harm to all Plaintiffs is real and immediate, any injury claimed by Defendant City of Fremont from the issuance of the requested injunctive relief is speculative and unsupported by any empirical or statistical evidence that non-citizens and ineligible immigrants have caused problems for the City. Moreover, Defendant will suffer no harm by not enforcing an unconstitutional statute, *Saint v. Nebraska Sch. Activities Ass'n*, 684 F. Supp. at 628 (*citing Planned Parenthood,* 558 F.2d 861), especially a statute that the City Council rejected and whose constitutionally it challenged in state court. *See supra* BACKGROUND, I.

## IV. Granting the Preliminary Injunction is in the Public Interest.

The public interest is greatly served by preventing the enforcement of an ordinance that violates the United States Constitution and does not remedy any identified problems. *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338-39 (5th Cir. 1981). Moreover, "it is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon***,** 545 F.3d 685**,** 690 (8th Cir. 2008); *see also Planned Parenthood Minnesota, North Dakota, South Dakota*, 530 F.3d at 752. Furthermore, because the harm in this case involves a municipality interfering with federal powers, the potential harm is to the entire nation. As the Supreme Court noted, the "[l]egal imposition of distinct, unusual and extraordinary burdens and obligations upon aliens . . . bears an inseparable relationship to the welfare and tranquility of all states, and not merely to the welfare and tranquility of one." *Hines*, 312 U.S. at 66.

## CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that the Court issue a preliminary injunction prohibiting enforcement of the Ordinance.

DATED: JULY 21, 2010

Respectfully submitted,

/s Shirley Mora James
Shirley Mora James, NSBA #19705
MORA JAMES LAW
601 Calvert Street, Suite A
P. O. Box 21772
Lincoln, NE 68542
T: (402) 890-2295
F: (402) 435-1006
E: SA@MoraJamesLaw.com

Ricardo Meza*
IL State Bar No. 6202784
Alejandro Aixala*
IL State Bar No. 6295749
MEXICAN AMERICAN LEGAL DEFENSE AND EDUCATIONAL FUND
11 E. Adams St.
Suite 700
Chicago, IL 60603
Tel: (312) 427- 0701
Fax: (312) 427-0691

*Application for admission pending

**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

I certify that on July 21, 2010, I electronically submitted the following document with the Clerk of the Court for the U.S. District Court for the District Court of Nebraska, using the electronic case filing system of the court. I also certify that I served the following document to Defendant City of Fremont via U.S. certified mail postage pre-paid.

/s Shirley Mora James
Shirley Mora James